**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ERIC IVERSON,<br>Oude Waalsdorperweg 10 2597 AK<br>The Hague<br>The Netherlands | ) ) ) ) )<br>CASE NO: 25-1353 |
| *Plaintiff,* | ) )<br> |
| | )<br>**COMPLAINT** |
| *v.* | ) ) ) |
| DONALD J. TRUMP,<br>President,<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500, | ) ) ) )<br>DATE: May 5, 2025 |
| PAMELA BONDI,<br>Attorney General,<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530, | ) ) ) ) ) |
| SCOTT BESSENT,<br>Secretary of the Treasury,<br>1500 Pennsylvania Avenue NW<br>Washington, DC 20220, | ) ) ) ) ) |
| MARCO RUBIO,<br>Secretary of State,<br>2201 C Street NW<br>Washington, DC 20451, | ) ) ) ) ) |
| *Defendants.* | ) ) ) |

**NATURE OF THE CASE**

1.      Plaintiff, Eric Iverson, is a U.S. citizen, a decorated Army veteran, and since

2010, a prosecutor in the International Criminal Court (ICC), Office of the Prosecutor (OTP). He

is presently the lead prosecutor in cases supported by the United States against individuals

accused of committing war crimes, genocide, and crimes against humanity in the Darfur region

of Sudan. Mr. Iverson's practice of law under the auspices of the ICC's OTP constitutes

1

expression that is protected by the First Amendment. Yet, Defendants have prevented Mr. Iverson from investigating and prosecuting the mass atrocities in Darfur, because the President issued an overbroad executive order authorizing sanctions against the ICC and its Prosecutor, out of a stated concern that the ICC will investigate what the order describes as "protected persons," i.e., nationals of the United States and its allies.

2.      Plaintiff does not work and has not worked on any investigation involving "protected persons." He has waited for several months for the Department of the Treasury, Office of Foreign Asset Control (OFAC) to issue regulations that narrow the needlessly broad sweep of the executive order, or to grant a license that would enable him to resume his investigation of crimes committed in Darfur. No regulations or license have been forthcoming.

3.      Therefore, Plaintiff files this suit to challenge Defendants' imposition of overbroad and *ultra vires* sanctions that violate his First Amendment rights and that exceed the statutory limits that Congress has imposed on the President's use of sanctions. On those bases, Plaintiff asks this Court to declare that the executive order violates the First Amendment and is *ultra vires*, and to enjoin its enforcement against him.

## JURISDICTION & VENUE

4.      This Court has subject matter jurisdiction to grant the relief requested pursuant to 5 U.S.C. § 702; 28 U.S.C. §§ 2201, 2202, & 1331, and the Court's inherent equitable powers.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(1).

## THE PARTIES

6.      Plaintiff, Eric Iverson, is a U.S. citizen, licensed attorney, and U.S. Army veteran. Declaration of Eric Iverson, May 2, 2025 (Attachment A) (Iverson Decl.). In October 2010, Mr. Iverson accepted a position as a Trial Lawyer in the International Criminal Court, Office of the Prosecutor, where he worked as a trial lawyer in the trials of *Prosecutor v. Bemba, Prosecutor v.*

*Ntaganda,* and *Prosecutor v. Yekatom et al*, arising out of events in the Central African Republic and the Democratic Republic of the Congo. *Id.* ¶ 6. In 2021, Mr. Iverson was assigned to the Darfur Unified Team and subsequently elevated to be the Head of that team. He is lead counsel on the cases of *Prosecutor v. Al-Bashir, Prosecutor v. Hussein, Prosecutor v. Harun*, and on ongoing investigations arising out of the armed conflict in the situation in Darfur, Sudan. *Id.* ¶ 13.

7.    Defendant, Donald Trump, is a citizen of the United States and serves as the President of the United States. Mr. Trump is being sued in his official capacity for actions beyond his authority and in violation of the constitution and laws of the United States.

8.    Defendant, Pamela Bondi, is a citizen of the United States and serves as the Attorney General. Ms. Bondi is being sued in her official capacity to enjoin actions beyond her authority and in violation of the constitution and laws of the United States.

9.    Defendant, Scott Bessent, is a citizen of the United States and serves as the Secretary of the Treasury. Mr. Bessent is being sued in his official capacity to enjoin actions beyond his authority and in violation of the constitution and laws of the United States.

10.    Defendant, Marco Rubio, is a citizen of the United States and serves as the Secretary of State. Mr. Rubio is being sued in his official capacity to enjoin actions beyond his authority and in violation of the constitution and laws of the United States.

## FACTUAL BACKGROUND

### A. The International Criminal Court

11.    The ICC is a permanent international institution headquartered in The Hague, The Netherlands. It was created pursuant to the 1998 Rome Statute of the International Criminal Court (Rome Statute), the culmination of a decades-long push by the international community—

including the United States—for a transnational forum in which victims of the gravest crimes could seek justice. 2187 U.N.T.S. 90.

12.     The movement for international criminal justice emerged from the aftermath of the Holocaust, and the United States was a driving force behind the effort to hold Nazi-era war criminals to account through the Nuremberg Trials. Throughout the latter half of the 20th century, as unspeakable horrors unfolded in Cambodia, the former Yugoslavia, Rwanda, Sierra Leone, and other conflict zones, the United States supported the creation of international criminal tribunals to address atrocity crimes committed in those jurisdictions. When President Clinton signed the Rome Statute in 2000, he noted the United States's "long history of commitment to the principle of accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda." Statement on the Rome Treaty on the International Criminal Court, 37 Weekly Comp. Pres. Doc. 4, Dec. 31, 2000.

13.     Presently, 125 countries are parties to the Rome Statute. Of the 32 members of NATO, 30 are parties to the Rome Statute. The United States has signed the Rome Statute, but the Senate has not ratified it.

14.     The ICC has "the power to exercise its jurisdiction over persons for the most serious crimes of international concern." Rome Statute, art. 1. These include genocide, crimes against humanity, war crimes, and the crime of aggression. *Id*. art. 5. The ICC's jurisdiction is limited to crimes committed from July 1, 2002, onward within the territory of a member state, by nationals of a member state after that state's accession to the Rome Statute, at the member state's election, or upon referral by the United Nations Security Council. *Id*. art. 11(1).

4

15.      The OTP is one of four "organs" that comprise the ICC and is responsible for examining situations where international crimes under the jurisdiction of the ICC are alleged to have been committed, carrying out investigations of such situations, and prosecuting individuals who are charged with those crimes. The OTP employs approximately 380 staff members of over 80 different nationalities, who all serve under the direct control of the Prosecutor, except in cases where the Prosecutor has been recused. Under the Rome Statute, the Prosecutor has "full authority over the management and administration of the Office, including the staff, facilities and other resources thereof." Rome Statute, art. 42(1); *see also* Staff Regulations for the International Criminal Court § 1.2(c). OTP personnel are, by rule, "at the disposal of the … the Prosecutor, as appropriate, for the performance of official functions." Staff Rules of the International Criminal Court, 101.9(b).

16.      To conduct investigations, the Prosecutor sends missions – usually composed of investigators, cooperation advisers, and prosecutors from the OTP – to concerned countries, where OTP personnel collect and examine physical evidence, question victims and witnesses, and then report back regarding the product of their investigations for ultimate review by the Prosecutor. Neither the OTP nor the ICC more generally has any independent enforcement authority, or the means to compel process. Instead, the ICC and its organs must rely upon member states to arrest individuals subject to arrest warrants issued by the Court.

17.      Cases before the ICC are brought in the name of the Prosecutor. Unless the Prosecutor is recused, or otherwise disqualified from a particular case, the Prosecutor serves as lead counsel, is responsible for signing any pleadings submitted, and is responsible formally and professionally for the conduct of any prosecution. The current Prosecutor is Karim A.A. Khan,

KC, a barrister from the United Kingdom, who was elected by the Assembly of State Parties to

the Rome Statute as the Prosecutor of the ICC on February 12, 2021.

**B.  The United States' relationship to the ICC**

18.    Despite its general support for the ICC, the United States has long opposed the

ICC's exercise of jurisdiction over U.S. citizens. When President Clinton signed the Rome

Statute in 2000, he recommended that the Senate defer ratification until the Rome Statute was

amended to guarantee certain procedural due process rights and exemptions for American

citizens. 22 U.S.C. § 7421(6)-(7).

19.    John Bolton, who would go on to serve as the Bush Administration's U.N.

Ambassador, wrote an op-ed the week after President Clinton signed the Rome Statute, objecting

that it threatened the autonomy of U.S. political leaders. John Bolton, *Unsign That Treaty*,

Washington Post, January 2, 2001. In a subsequent law review article, Bolton warned:

> A fair reading of the treaty, for example, leaves the objective observer
> unable to answer with confidence whether the United States was guilty of
> war crimes for its aerial bombing campaigns over Germany and Japan in
> World War II. … This is intolerable and unacceptable. The list of
> ambiguities goes on and on. How will these vague phrases be interpreted?
> Who will advise a President that he is unequivocally safe from the
> retroactive imposition of criminal liability if he guesses wrong? Is even the
> defensive use of nuclear weapons a criminal violation? ...
>
> Moreover, there is no doubt that Israel will be the target of a complaint
> concerning conditions and practices by the Israeli military in the West Bank
> and Gaza. The United States, with continuous bipartisan support for many
> years, has attempted to minimize the disruptive role that the United Nations
> has all too often played in the Middle East peace process. We do not now
> need the ICC interjecting itself into extremely delicate matters at
> inappropriate times. Israel, therefore, was one of the few governments that
> voted with the United States against the statute.

John Bolton, *The Risks and Weaknesses of the International Criminal Court from America's*

*Perspective*, 64 Law and Contemporary Problems 167 (2001).

20.     In June 2002, the Congressional Research Service summarized the Rome

Statute's "Political Implications" as follows:

> Perspectives differ on the impact of the ICC on U.S. interests, once it begins
> operation. Some see the ICC as a fundamental threat to the U.S. armed
> forces, its ***political leaders***, and U.S. defense and foreign policy. Others see
> it as a valuable foreign policy tool for defining and deterring crimes against
> humanity, a step forward in the decades-long U.S. effort to end impunity
> for egregious mass crimes.

CRS Report for Congress, RL21437, International Criminal Court: Overview and Selected Legal

Issues (June 5, 2002) (emphasis added). Two months later, Congress enacted the American

Servicemembers' Protection Act (ASPA), 116 Stat. 899 (codified at 22 U.S.C. §§ 7421, *et seq*.),

to address the risk of U.S. persons "being detained or imprisoned by, on behalf of, or at the

request of the International Criminal Court." 22 U.S.C. § 7427. In enacting this law, Congress

found "the Rome Statute creates a risk that the President and other senior elected and appointed

officials of the United States Government may be prosecuted by the International Criminal

Court. … No less than members of the Armed Forces of the United States, senior officials of the

United States Government should be free from the risk of prosecution by the International

Criminal Court, especially with respect to official actions taken by them to protect the national

interests of the United States." 22 U.S.C. § 7421(9).

21.     While the ASPA broadly regulates the United States' relationship to the ICC to

advance this purpose, Congress also permitted the United States to support ICC activities under

certain circumstances. *Id*. §7422(c), §7433.  Section 7433, for its part, provides statutory

protection for many activities supporting the ICC's efforts: "Nothing in this subchapter shall

prohibit the United States from rendering assistance to international efforts to bring to justice

Saddam Hussein, Slobodan Milosovic, Osama bin Laden, other members of Al Queda [sic],

leaders of Islamic Jihad, and other foreign nationals accused of genocide, war crimes or crimes

against humanity, or from rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine."

22.    The United States has provided direct support to the work of the ICC in multiple situations consistent with its foreign policy interests.  This support has transcended party lines, as both Democratic and Republican administrations have assisted several prominent ICC investigations and prosecutions.

23.    On March 31, 2005, for example, the UN Security Council referred the situation in Darfur, Sudan, to the ICC for prosecution. UNSC, Resolution 1593, S/RES/1593 (2005). The United States contributed to the drafting of the resolution and acceded to its passage. In stating the reasons for its position, the Ambassador to the United Nations stated that the United States preferred the creation of an ad hoc tribunal, but acceded to the Security Council's referral of the situation to the ICC's jurisdiction, notwithstanding the fact that Sudan was not a party to the Rome Statute, "because of the need for the international community to work together in order to end the climate of impunity in Sudan, and because the resolution provides protection from investigation or prosecution for U.S. nationals and members of the armed forces of non-state parties." Explanation of Vote on the Sudan Accountability Resolution, USUN Press Release #055 (05) (March 31, 2005).

24.    On October 31, 2006, Congress endorsed the ICC's Darfur prosecution and authorized the President to impose blocking sanctions against "any individual who the President determines is complicit in, or responsible for, acts of genocide, war crimes, or crimes against humanity in Darfur."  Darfur Peace and Accountability Act of 2006, P.L. 109-344 (October 13, 2006), 120 Stat. 1869. President Bush implemented these sanctions the same day. EO 13412, 71 Fed. Reg. 61396 (October 13, 2006).

25.     Over the intervening two decades, Congress has supported the ICC's Darfur investigation and prosecution through resolutions. *See*, *e.g.*, S. Res. 188, 165 Cong. Rec. S4736 (Senate resolution approving of the work of the ICC in prosecuting former Sudanese president Al-Omar Al-Bashir). The most recent resolution was in November 2024, when the House passed by a super-majority voice vote, a resolution to "support[] tribunals and international criminal investigations to hold the [Sudanese Rapid Support Forces] and allied militias accountable for war crimes, crimes against humanity, and genocide." Recognizing the actions of the Rapid Support Forces and allied militias in the Darfur region of Sudan against non-Arab ethnic communities as acts of genocide, H.Res. 1328 (November 20, 2024). The ICC is the only tribunal currently mandated to hold such individuals responsible, and the OTP is conducting the only international criminal investigation into these matters.

26.     In 2020, Congress passed and the President signed a National Defense Appropriations Act that reiterated, "It is the policy of the United States to … promot[e] accountability for genocide, war crimes, crimes against humanity, and sexual and gender-based violence" and authorized the President, "[n]otwithstanding any other provision of law," to provide foreign aid "(1) to build the capacity of civilian investigators within and outside of Sudan on how to document, investigate, develop findings of, identify, and locate those responsible for war crimes, crimes against humanity, or genocide in Sudan; [and] (2) to collect, document, and protect evidence of war crimes, crimes against humanity, and genocide in Sudan and preserve the chain of custody for such evidence, including by providing support for Sudanese, foreign, and international nongovernmental organizations, and other entities engaged in such investigative activities." William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, 134 Stat. 3388 §§ 1263, 1267.

27.     Every administration from the George W. Bush Administration to the present administration has supported the prosecution of those culpable for genocide, war crimes, and crimes against humanity in Darfur before the ICC. On January 7, 2025, Secretary of State Antony Blinken found the conflict in Sudan "has resulted in the world's largest humanitarian catastrophe, leaving 638,000 Sudanese experiencing the worst famine in Sudan's recent history, over 30 million people in need of humanitarian assistance, and tens of thousands dead." Press Statement of Secretary of State Antony Blinken, Genocide Determination in Sudan and Imposing Accountability Measures, January 7, 2025.[1] He also concluded that "war crimes," "crimes against humanity and ethnic cleansing" had been committed in Sudan, culminating in a formal determination of genocide in Sudan and the announcement of various accountability measures. *Id*.

28.     Similarly, the Trump administration has supported international accountability measures for Darfur war criminals, to include the ICC's investigation. On January 27, 2025, Ambassador Dorothy Shea stated the United States position at the U.N. Security Council Briefing by the ICC Prosecutor that "Those responsible for these terrible crimes must be held accountable. Many responsible for atrocities over 20 years ago in Sudan remain at large. We urge the international community to work to bring those individuals to trial so they can be publicly held to account for their alleged crimes." Remarks by Ambassador Dorothy Shea, Chargé d'Affaires ad interim, at a U.N. Security Council Briefing by the ICC Prosecutor, January 27, 2025.[2]

---

[1] https://geneva.usmission.gov/2025/01/07/genocide-determination-in-sudan/
[2] https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-by-the-icc-prosecutor-for-sudan-4/

29.    Following an April 2025 outbreak of violence in Sudan that "targeted civilians and humanitarian actors in Zamzam and Abu Shouk … including killings of at least 10 U.S.-funded relief workers," the State Department reiterated the United States' humanitarian and foreign policy interests in upholding "international humanitarian law" in Sudan:

> The belligerents must uphold their obligations under international humanitarian law and must be held accountable … [T]his conflict has caused death, destruction, and a displacement crisis that has the potential to destabilize the entire region, with massive flows of displaced people, arms, and disease.

Tammy Bruce, Press Briefing (April 15, 2025).[3]

30.    To these ends, the State Department is offering a reward of "up to $5 million for information leading to [the] arrest [of Ahmad Mohammad Harun], transfer to the ICC, or conviction." U.S. Department of State's Global Criminal Justice Rewards Program.[4] Ahmad Mohammad Harun is a former Sudanese government minister and is subject to United States sanctions as a Specially Designated National (SDN).

31.    The United States has also endorsed other ICC investigations deemed to be in the national interest. In 2011, the United States voted with U.N. Security Council to refer the situation in Libya to the ICC for investigation and specifically urged "all States and concerned regional and other international organizations to cooperate fully with the Court and the Prosecutor." UNSC Res. 1700, ¶¶ 4-5 (Feb. 26, 2011). The United States Ambassador to the United Nations celebrated this resolution, saying "for the first time ever, the Security Council has

---

[3] https://www.state.gov/briefings/department-press-briefing-april-15-2025
[4] *Available at* https://2021-2025.state.gov/global-criminal-justice-program/current-reward-offers/. The State Department page for the Global Criminal Justice Rewards Program no longer advertises ICC rewards at the time of this filing: https://www.state.gov/global-criminal-justice-program/. However, there is no indication that the offer of these rewards has been withdrawn.

unanimously referred an egregious human rights situation to the International Criminal Court." United Nations, Security Council, 6491st Meeting, S/PV.6491, Feb. 26, 2011, at 3.

32.    In 2013, the United States turned Bosco Ntaganda over to the ICC for prosecution for war crimes committed in the Democratic Republic of Congo after he sought refuge in the U.S. Embassy in Rwanda. Jeffrey Gettleman, *Team on the Way to Collect Congo War Crimes Suspect*, N.Y. Times, March 21, 2013, at A6. This action was unanimously endorsed in a resolution by the Senate. S. Res. 144, 159 Cong Rec. S5302.

33.    In 2015, the United States transferred Dominic Ongwen, who had been taken into custody by the U.S. military to the ICC. The State Department publicly "welcome[d] the transfer of Dominic Ongwen by Central African authorities to the International Criminal Court." U.S. Department of State, Press Release, "Transfer of Dominic Ongwen to the International Criminal Court," January 20, 2015.

34.    Congress has passed various legislation supporting the work of the ICC beyond Darfur as well. In 2008, Congress authorized military assistance to state parties of the ICC. National Defense Authorization Act for Fiscal Year 2008, 122 Stat. 3 § 1212. Congress enabled the State Department to offer monetary rewards to individuals who provide information to facilitate the arrest of foreign individuals wanted by the ICC. Department of State Rewards Program Update and Technical Corrections Act of 2012, 126 Stat. 2492.

35.    Congress has endorsed the work of the ICC outside Darfur in several joint and chamber-specific resolutions. *See*, *e.g.*, S. Res. 90, 159 Cong. Rec. S2853 (Senate resolution "call[ing] on the Government of Kenya to respect commitments to seek justice for the victims of political violence, including by honoring its obligations under the Rome Statute to cooperate fully with the International Criminal Court."); S.Con.Res.16, 153 Cong. Rec. S2540 (Joint

resolution citing the ICC's work to condemn the Lord's Resistance Army in Uganda); S. Res.

402, 158 Cong. Rec. S6007 (reiterating the Senate's support for the prosecution of Joseph Kony).

36.    In 2022, the Senate unanimously passed a resolution relating to the ICC's

investigation of Russian crimes in Ukraine, stating "the International Criminal Court (ICC) is an

international tribunal that seeks to uphold the rule of law, especially in areas where no rule of

law exists, by investigating and trying individuals charged 'with the gravest crimes of concern to

the international community: genocide, war crimes, crimes against humanity and the crime of

aggression'" and resolved to "encourage[] member states to petition the ICC or other appropriate

international tribunal to take any appropriate steps to investigate war crimes and crimes against

humanity committed by the Russian Armed Forces and their proxies and President Putin's

military commanders, at the direction of President Vladimir Putin." A resolution expressing the

sense of the Senate condemning the Russian Federation, President Vladimir Putin, members of

the Russian Security Council, the Russian Armed Forces, and Russian military commanders for

committing atrocities, including alleged war crimes, against the people of Ukraine and others,

S.Res. 546, March 15, 2022.

37.    In 2024, Congress appropriated funds to support the ICC directly. This included

"not less than $2,500,000 as a contribution to the Trust Fund for Victims" that is associated with

the ICC. An additional $2,500,000 was also appropriated for "Assistance to International

Efforts" that include supporting the ICC's investigations and prosecutions of foreign nationals

related to the situation in Ukraine. Public Law 118-47, Section 7034(r).

38.    In October 2024, the Legal Advisor to the United States Mission to the United

Nations extolled the virtues of the ICC's work to the United Nations General Assembly: "The

United States remains steadfast in its commitment to international justice and promoting

accountability for violations of international humanitarian law … The work of the International

Criminal Court is vital to this mission, and we welcome the ICC's continued efforts … to deliver

justice in situations where atrocities have been committed with impunity, including in Ukraine,

Darfur, and the Central African Republic."  Mark Simonoff, United States Mission to the UN,

October 28, 2024.[5]

39.    U.S. courts have consistently cited the Rome Statute and the work of the ICC to

interpret international law, *see, e.g.*, *Jesner v. Arab Bank*, PLC, 138 S. Ct. 1386, 1401 (2018);

*Nahl v. Jaoude*, 968 F.3d 173, 188 (2d Cir. 2020); *Simon v. Republic of Hungary*, 812 F.3d 127,

143 (D.C. Cir. 2016); *Hamdan v. United States*, 696 F.3d 1238, 1250 (D.C. Cir. 2012), *overruled

on other grounds by Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014); *Doe v. Exxon Mobil

Corp.*, 391 F. Supp. 3d 76, 90 (D.D.C. 2019), and to evaluate applications for asylum. *See, e.g.*,

*Wanjiru v. Holder*, 705 F.3d 258, 260 (7th Cir. 2013).

**C.  The International Emergency Economic Powers Act (IEEPA)**

40.    IEEPA authorizes the President to take specific actions in response to a national

emergency constituting an "unusual and extraordinary threat, which has its source in whole or

substantial part outside the United States, to the national security, foreign policy, or economy of

the United States." 50 U.S.C. § 1701(a). In particular, once the President has declared such an

emergency, IEEPA permits the President to:

> block during the pendency of an investigation, regulate, direct and compel, nullify,
> void, prevent or prohibit, any acquisition, holding, withholding, use, transfer,
> withdrawal, transportation, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect to, or transactions involving,
> any property in which any foreign country or a national thereof has any interest by
> any person, or with respect to any property, subject to the jurisdiction of the United
> States. *Id*. § 1702(a)(1)(B).

---

[5]  https://usun.usmission.gov/remarks-at-a-un-general-assembly-meeting-on-a-report-of-the-international-criminal-court-2/

41.     The President may impose IEEPA sanctions only to respond to the "new threat" that gave rise to the national emergency—not for any other purpose. *Id.* § 1701(b). *See also* H.R. Rep. 95–459 at 10 (1977) (legislative history describing this limitation).

42.     IEEPA sanctions regimes are implemented by the creation of designated foreign national "lists" that are administered by the Treasury Department's Office of Foreign Asset Control (OFAC). Individuals subject to sanctions under IEEPA, so-called Specially Designated Nationals (SDNs), are said to be on "the OFAC List." Once SDNs are on the OFAC List, they are sometimes described as being subjected to "civil death," insofar as it becomes functionally unlawful for them to be employed, to access banking services, to travel, or to engage in most commerce that is basic to modern life.[6]

43.     IEEPA makes it unlawful for anyone "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). The consequences of violating IEEPA sanctions can be extremely severe. Anyone who violates IEEPA sanctions, intentionally or not, may be subject to a civil penalty equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation. 50 U.S.C. § 1705(b); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). Anyone who willfully violates IEEPA sanctions, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to twenty years in prison. 50 U.S.C. § 1705(c). The government has also prosecuted people for conspiracy to commit an offense against the United States under 18 U.S.C. § 371 in connection with the planned violation of an IEEPA order.

---

[6] *See* Adam Smith, Dissecting the Executive Order on ICC Sanctions (June 15, 2020) *at* https://www.justsecurity.org/70779/dissecting-the-executive-order-on-intl-criminal-court-sanctions-scope-effectiveness-and-tradeoffs/

44.     OFAC is responsible for the civil enforcement of IEEPA sanctions regimes, and it regularly imposes civil penalties on individuals and entities for IEEPA violations.

45.     The Department of Justice is responsible for the criminal enforcement of IEEPA sanctions regimes, and it has frequently prosecuted persons for IEEPA violations.[7]

46.     Thus, IEEPA orders trigger two distinct sets of consequences: (1) designation of sanctioned persons and their addition to the SDN List, and (2) enforcement of civil and criminal penalties for dealing in blocked property or providing goods or services to or for the benefit of a designated person. The threat of such penalties deters individuals, financial institutions, and other businesses and entities from interacting with designated persons.

47.     Congress has imposed restrictions on the President's authority under IEEPA. In addition to limiting the President's authority to "unusual and extraordinary threat[s]", IEEPA expressly denies the President "the authority to regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials[.]" 50 U.S.C. § 1702(b). OFAC interprets this statutory limitation as applying only to information or informational materials fully created and in existence at the time of the transaction with the sanctioned person. *See, e.g.*, 31 C.F.R. § 560.210(c)(2).

48.     Only once before has a President attempted to use IEEPA to impose economic sanctions against the ICC. That attempt came in 2020 with EO 13928, when President Trump imposed sanctions on the ICC Prosecutor and one of her deputies. *See* EO 13928, Blocking Property of Certain Persons Associated With the International Criminal Court, 85 Fed. Reg.

---

[7] *See* Summary of Major U.S. Export Enforcement, Economic Espionage, and Sanctions-Related Criminal Cases, U.S. Dep't of Justice (Nov. 2019), https://www.justice.gov/nsd/page/file/1044446/download.

36139 (June 15, 2020). In January 2021, the U.S. District Court for the Southern District of New York preliminarily enjoined the enforcement of EO 13928 because it violated the First Amendment. *OSJI v. Trump*, 510 F.Supp.3d 198 (S.D.N.Y. 2021) ("the restrictions prohibit or chill significantly more speech than even Defendants seem to believe is necessary to achieve their end, i.e., to obtain and exert leverage over [ICC personnel] so as to induce them to desist from their investigation of U.S. and allied personnel").

### D. Executive Order 14203

49.    On February 6, 2025, President Trump issued EO 14203, Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 § 1 (February 6, 2025) (EO 14203), which was substantively identical to EO 13928. The President determined "that any effort by the ICC to investigate, arrest, detain, or prosecute ***protected persons***, as defined in section 8(d) of this order, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States, and [] hereby declar[ing] a national emergency to address that threat."

50.    The President made clear that the relevant threat was the ICC's investigation and prosecution of "protected persons" only, and authorized blocking sanctions to counter "any ICC actions against the United States, Israel, or any other ally of the United States that has not consented to ICC jurisdiction." *Id*. "Protected person" is defined as a national of an "ally of the United States," which is, in turn, defined as a NATO member state or a "major non-NATO ally" (MNNA). *Id*. § 8(d). There are currently 19 countries designated as MNNAs as well as Taiwan.[8] Sudanese nationals, such as those being prosecuted for perpetrating genocide in Darfur, are not protected persons.

---

[8] The current MNNAs are Argentina, Australia, Bahrain, Brazil, Colombia, Egypt, Israel, Japan, Jordan, Kenya, Kuwait, Morocco, New Zealand, Pakistan, the Philippines, Qatar, South Korea, Thailand, and Tunisia.

51.     EO 14203 imposes blocking sanctions on foreign persons who are deemed to have "directly engaged" or "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of," or were "owned or controlled by, or … have acted or purported to act for on behalf of, directly or indirectly" the International Criminal Court's efforts to "investigate, arrest, detain or prosecute a protected person without consent of that person's country of nationality." EO 14203 § 1.

52.     EO 14203 prohibits individuals from directly or indirectly providing funds, goods, or services to or for the benefit of an SDN, or receiving funds, goods, or services from an SDN. It is also unlawful to cause or conspire to another person to violate EO 14203 or to evade the prohibitions of EO 14203. Engaging in conduct prohibited by EO 14203 may incur civil and criminal liability.

53.     As noted, OFAC and the Justice Department are empowered to enforce EO 14203's prohibitions. Civil liability, which can be imposed by OFAC for any violation on a strict liability basis, extends up to $377,700 per violation. Criminal liability, which can be imposed for willful violations of EO 14203, extends up to a $1,000,000 fine per violation and/or imprisonment for up to twenty years.

54.     On February 9, 2025, the President published an Annex to EO 14203, which designated Karim Khan, the Prosecutor of the OTP, as an SDN.

**E.  EO 14203 Impairs Plaintiff's ability to Carry Out his Professional Duties.**

55.     EO 14203 and the designation of the ICC Prosecutor as an SDN directly impairs, if not totally prohibits, Mr. Iverson from engaging in the practice of law and engaging in otherwise protected expression as part of his professional duties as a prosecutor in the OTP. Iverson Decl. ¶¶ 26-30. Because EO 14203 has designated the ICC Prosecutor, there is a

substantial risk that any action taken by any staff member of the OTP will be construed by Defendants as the provision of a direct or indirect benefit to an SDN. The staff of the OTP are, by law, at the "disposal" of the Prosecutor, and entrusted by law with conducting criminal prosecutions under his direct supervision and control, and in his name.

56.    Nearly all – if not all – written legal analysis and pleadings prepared by Mr. Iverson in the normal course for the Prosecutor involve specialized knowledge. The same is true with respect to participating in meetings with the Prosecutor, or others acting under his control or on his behalf, providing presentations, advice, and training to the Prosecutor or those who serve at the Prosecutor's direction; conducting and supervising research in support of pleadings signed by the Prosecutor and/or filed at his direction; as well as making legal arguments, examining witnesses, or otherwise engaging in the practice of law in support of ICC prosecutions for which the Prosecutor has not been disqualified. And the Prosecutor is lead counsel on all cases but one involving Darfur. *See* Statement of ICC Prosecutor Karim Khan to the United Nations Security Council on the Situation in Darfur, pursuant to Resolution 1593, January 28, 2025 ("my Office is taking the necessary steps to put forward applications for warrants of arrest in relation to crimes we allege are being committed, and have been committed, in West Darfur.").[9]  Under the broad terms of EO 14203 as written, there is a non-speculative risk that if Mr. Iverson engages in these routine forms of expressive conduct that all are incident to the ordinary practice of law, it will be deemed by Defendants to be the provision of "education, training, advice, and other forms of assistance," "interactive services," or "bespoke' legal services" to an SDN. *OSJI*, 510 F.Supp.3d

---

[9] https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-united-nations-security-council-situation-darfur

at 210; *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010); *United States v. Balagia*, Case No. 21-40366 (5th Cir., Feb. 6, 2023).

57.    Mr. Iverson and those he supervises are routinely required to travel on mission to conduct investigations into war crimes, crimes against humanity, and genocide under the auspices of the OTP. Iverson Decl. ¶ 27. Those missions are conducted at the direction and under the control of the Prosecutor. Participating in those missions necessarily involves the collection and preparation of non-public information for ultimate use in OTP prosecutions conducted under the authority of the Prosecutor. Under the broad terms of EO 14203, there is a non-speculative risk that such activities will be deemed by Defendants to be the prohibited receipt and provision of services and other things of value to an SDN. *See United States v. Amirnazmi*, 645 F.3d 564, 569 (3d Cir. 2011).

58.    By law, the Prosecutor determines what human, monetary, and material resources individual trial teams will have at their disposal. Mr. Iverson must coordinate with the Prosecutor to request resources for the purpose of conducting investigations and building cases for prosecution. Those communications necessarily involve the communication of non-public information. Under the broad terms of EO 14203, there is a non-speculative risk that those communications with an SDN and receiving resources that are at the direction of an SDN will be deemed by Defendants to be respectively, the provision of prohibited services to an SDN, and the receiving of material benefits from an SDN.

59.    In the absence of a specific license, which OFAC has thus far declined to grant, Mr. Iverson cannot take reasonable steps to avoid these non-speculative risks, short of abandoning his career and ceasing to practice law at the ICC. Indeed, OFAC's position is that liability for sanctions violations can result, even where individuals have attempted to comply

with a sanctions program in good faith. For example, in 2022, OFAC issued a Finding of Violation[10] against a bank that continued to service SDNs for approximately two weeks after their designations because, while the third-party KYC was implementing software changes to comply with sanctions, the software was slow to update. OFAC, *OFAC Issues a Finding of Violation to MidFirst Bank for Violations of the Weapons of Mass Destruction Proliferators Sanctions Regulations*, July 21, 2022.

60.     Critically, the fact that Mr. Iverson does not work on any matter involving a "protected person" within the meaning of EO 14203 provides no protection to him from EO 14203. That is because there is no carve out from the EO's prohibitions for work done for or in coordination with the ICC Prosecutor if such work is unrelated to "protected persons."  Thus, Mr. Iverson faces the imminent risk of ruinous civil penalties imposed on a strict liability basis, and/or criminal penalties including millions of dollars in fines and twenty years' imprisonment even if his professional activities relate only to prosecutions the United States has *supported* from their inception, such as those relating to Darfur. In fact, Mr. Iverson faces liability even if he continues to lead the investigation of international fugitive, Ahmad Mohammad Harun, for whom the United States is offering a $5,000,000 reward in support of his arrest and extradition to the ICC.

61.     These non-speculative risks have already caused material harms to and inhibited Mr. Iverson from engaging in the practice of law. Iverson Compl. ¶¶ 26-30. As lead counsel on the Darfur cases, Mr. Iverson must supervise investigations and lead subordinate prosecutors, investigators, and analysts who work on those investigations. As of February 9, 2025, when the

---

[10] A Finding of Violation, or "FOV," is an enforcement penalty akin to a citation. It is often used in place of a fine where the violation was self-reported and where OFAC has obtained additional assurances of future compliance.

Prosecutor was designated as an SDN, work on the Darfur cases has been significantly impaired. *Id*. Out of fear of being prosecuted or fined, Mr. Iverson has refrained from supervising the investigations, contacting witnesses and sources, or planning on-going projects. *Id*. These harms have been exacerbated by the fact that Mr. Iverson is one of the Darfur team's only Arabic speakers and is responsible for handling the Darfur team's most sensitive sources. *Id*. In short, EO 14203 has frozen Mr. Iverson's ability to investigate or otherwise develop cases for prosecution of grave humanitarian crimes in Darfur.

62.    After waiting sixty (60) days to see whether OFAC would issue general licenses or regulations narrowing EO 14203's broad sweep, the Association of International Criminal Law Prosecutors (AICLP) applied for a specific license for its members "to engage in the practice of law, or otherwise support the investigation, arrest, detention, and prosecution of individuals accused of international crimes before the ICC, provided that such conduct is not directed at a protected person without consent of that person's country of nationality within the meaning of E.O. 14203." Ref. No. AICLP-ICC-1, Case No. ICC-EO14203-2025-1370890-1 (April 7, 2025). AICLP is a tax-exempt nonstock corporation established under the laws of Maryland that serves as a professional association for individuals who have served or are serving as prosecutors, analysts, investigators, or other legal staff at an international or hybrid criminal tribunal/court, such as the International Criminal Court.

63.    Mr. Iverson is a member of AICLP and provided direct support to its specific license application, which named him. AICLP's specific license application remains pending before OFAC as of the date of this filing. Should OFAC grant AICLP's specific license application, Mr. Iverson's activities described above would all fall within its scope and this case would become moot.

**GROUNDS FOR RELIEF**

**GROUND I**
**EO 14203 Violates the First Amendment**

64.    Mr. Iverson incorporates by reference paragraph 4 – 63 *supra*.

65.    EO 14203 prohibits Mr. Iverson and others like him from engaging in speech and advocacy that Defendants determine constitutes the provision of services to Karim Khan, the Prosecutor for the ICC and the head of the OTP. Mr. Iverson wishes to continue pursuing his investigational and prosecutorial mandates in Darfur at the direction of the OTP but has been chilled from doing so because of the substantial risk that he will be penalized for providing services "for the benefit of" Prosecutor Khan.

66.    EO 141203 violates the First Amendment in at least three distinct ways. *First*, it is unlawfully overbroad by prohibiting First Amendment activities that have no relationship to the need to shield "protected persons" from investigation or prosecution before the ICC. *Second*, EO 14203 is a content-based restriction on speech that discriminates based on viewpoint by targeting only expression that could be construed as benefit the Prosecutor, while permitting expression that is adverse to the Prosecutor, even in the context of proceedings before the ICC. *Third*, EO 14203 broadly prohibits U.S. citizens, such as Mr. Iverson, from engaging in the core First Amendment protected activities that are incident to the practice of law, including conducting investigations to ascertain the truth, communicating with witnesses, experts, and others, preparing reports and memoranda, and advocating for criminal accountability.

## GROUND II
### EO 14203 Violates 50 U.S.C. § 1702(b)

67.    Mr. Iverson incorporates by reference paragraph 4 – 63 *supra*.

68.    IEEPA forbids the President from using its authorities to "regulate or prohibit, directly or indirectly … any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value," as well as the import/export of "any information or informational materials, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. §§ 1702(b)(1) and (3).

69.    The so-called "Berman Amendments" were enacted by Congress to ensure that the President could not use IEEPA authorities to "prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution." H.R. Conf. Rep. No. 103-482, at 239 (1994). To that end, the exception was "explicitly intended, by including the words 'directly or indirectly,' to have a broad scope," and to "facilitate transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission." *Id*.

70.    EO 14203 explicitly seeks to regulate transactions and activities incident to the flow of information. It designates "any effort by the ICC to investigate … or prosecute" particular individuals for particular crimes as sanctionable conduct, which expressly targets the collection and dissemination of information as well as advocacy. It further treats as sanctionable those who "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of," the dissemination of such information.

71.     The provisions bar Mr. Iverson from engaging in transactions involving information and informational materials, including legal filings and internal documents detailing evidence of grave crimes committed in Darfur to the Prosecutor, which activities he carries out in the normal course of his work as an ICC attorney. Under EO 14203, Mr. Iverson is at significant risk of severe civil and criminal penalties if he carries on these duties.

72.     EO 14203 violates § 1701(b) and is *ultra vires* of IEEPA because it purports to regulate or prohibit, and purports to authorize Defendants to regulate or prohibit, acts that are exempt from regulation or prohibition under IEEPA, including the transmission of information and informational materials, thereby chilling the provision of such materials. EO 14203 is therefore void.

### GROUND III
### EO 14203 Violates 50 U.S.C. § 1701(b)
### and Is Precluded by Subsequent Legislation

73.     Mr. Iverson incorporates by reference paragraph 4 – 63 *supra*.

74.     IEEPA is explicit that the President may only invoke its sanctions "to deal with an unusual and extraordinary threat" to the foreign policy interests of the United States.  50 U.S.C. § 1701(b).  Specifically, the President must be confronting a "new threat."  *Id*.  And the "authorities granted to the President" to impose sanctions and to enforce those sanctions with ruinous civil and criminal penalties, "may not be exercised for any other purpose."  *Id*.

75.     The threat EO 14203 purports to address is not "unusual," "extraordinary," or "new." To the contrary, in the American Servicemembers' Protection Act, Congress directly spoke to the risk of U.S. persons "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court." 22 U.S.C. § 7427. Congress has enacted a detailed regulatory scheme to address this risk. Congress has refrained from either imposing or

authorizing sanctions against the ICC or its personnel or creating any criminal penalties associated with the work of the ICC. When Congress enacted this law, and made subsequent amendments, the risks to the United States and its allies were well known; indeed, they were the impetus for the law's enactment. Congress has never enacted any criminal prohibitions to enforce these mandates. And Congress has declined to pass several legislative attempts to impose sanctions on the ICC.

76.    Congress has also authorized the provision of direct support to the ICC in connection with its activities, including on cases involving Darfur. Congress has also supported and endorsed the work of the ICC as being in the national interest. The probable and desired effect of EO 14203 is to nullify Congress' carefully crafted scheme, developed over two decades, to balance the risk that nationals of the United States and its allies might be subject to the jurisdiction of the ICC with Congress' equal recognition that the ICC performs work in the national interest.

77.    Rather than address itself to an "unusual and extraordinary threat," EO 14203 effectively criminalizes not only the work of the ICC Prosecutor, but of any U.S. person who works for the ICC's OTP anywhere in the world. Even the broad and general terms of IEEPA do not permit the President, through executive order, to override the specific and carefully crafted Congressional legislation respecting the ICC. EO 14203 is therefore precluded.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Iverson asks this honorable court to:

1.    Enter a judgment declaring that EO 14203 violates the First Amendment;

2.    Enter a judgment declaring that EO 14203 violates 50 U.S.C. § 1702(b);

3.    Enter a judgment declaring that EO 14203 violates 50 U.S.C. § 1701(b) because the threat the ICC poses to "protected persons" is not a "new" "unusual and extraordinary threat"

within the meaning of 50 U.S.C. § 1701(b), and is precluded by more specific Congressional legislation;

4.     Enter a judgment enjoining Defendants from commencing or authorizing any prosecution of Mr. Iverson under EO 14203 or IEEPA for exercising his First Amendment rights, including by engaging in the practice of law, in relation to his work on Darfur;

5.     Enter a judgment enjoining Defendants from commencing or authorizing any civil enforcement proceeding against Mr. Iverson under EO 14203 or IEEPA, in relation to his work on Darfur;

6.     Award Mr. Iverson his costs and reasonable attorneys' fees incurred in this action; and

7.     Order other such relief as this Court deems proper.

                                        Respectfully submitted,

Dated: May 5, 2025
Washington, D.C.

                                        /s/ Allison Ferber Miller
                                        Allison Ferber Miller
                                        Law Office of Allison Ferber Miller
                                        5619 2nd Street South
                                        Arlington, VA 22204
                                        (321) 945-7615

                                        Joshua Colangelo-Bryan*
                                        HUMAN RIGHTS FIRST
                                        121 West 36th Street, PMB 520
                                        New York, NY 10018
                                        (212) 845-5243
                                        * Pro hac vice application forthcoming

                                        Attorneys for Plaintiff

**Attachment A**

**Declaration of Eric Iverson, May 2, 2025 (Redacted)**

**FILED UNDER SEAL**

**DECLARATION OF ERIC R. IVERSON**

I, Eric R. Iverson, hereby declare as follows:

1.      I am a U.S. citizen, an attorney, and a member of the bar of South Dakota. I am currently serving as the Head of the Darfur Unified Team and lead counsel for the Office of the Prosecutor (OTP) of the International Criminal Court (ICC) in its investigations of alleged war crimes and atrocities committed in Darfur, Sudan. My supervisory responsibilities include directing evidence collection, coordinating with international and local partners, and developing prosecutorial legal strategies to ensure accountability for these grave crimes.



3.      EO 14203 prevents me from proposing or executing an investigative strategy ▮▮▮▮▮▮▮▮▮▮, because doing so requires that I coordinate my investigative activities with the Prosecutor, Karim Khan, who has been designated as a Specially Designated National (SDN). This has precluded me from investigating and establishing a record of the very mass atrocities for which I am particularly skilled to investigate, because I cannot consistent with EO 14203, directly and/or indirectly provide expert services and benefits to Karim Khan.

1

**FILED UNDER SEAL**

**FILED UNDER SEAL**

**Background**

4.      I am a fifth-generation South Dakotan and the first non-farmer/rancher in my

family.  n 1998, the Army awarded me an ROTC "Green to Gold"

scholarship, which allowed me to attend and graduate from the University of Minnesota in

2001 with a degree in International Relations. In 2002, I completed an LLM in International

Human Rights Law at Utrecht University, The Netherlands. In February 2003, I was

commissioned as a second lieutenant and received an educational delay to attend law school

at American University, from where I graduated in May 2006.

5.       In October 2006, I entered active

duty in the U.S. Army Judge Advocate General's Corps with which I served until I resigned

from active duty in 2010.

**Structure of the ICC**

6.      In October 2010, I accepted a position as a Trial Lawyer in the ICC's OTP. In

that position I served as a prosecutor on the trials of *Prosecutor v. Bemba, Prosecutor v.

Ntaganda,* and *Prosecutor v. Yekatom et al*, all arising out of events in the Central African

Republic and the Democratic Republic of the Congo.

7.      Pursuant to Article 42 of the Rome Statute that established the ICC, the OTP

is mandated to act independently as a separate organ of the ICC in the investigation and

2

**FILED UNDER SEAL**

FILED UNDER SEAL

prosecution of crimes within the ICC's jurisdiction. The OTP is headed by the Prosecutor of the ICC and two Deputy Prosecutors, who are elected by the members of the Assembly of States Parties.

8.    All OTP staff serve under the direct supervision and control of the Prosecutor, except in cases where the Prosecutor has been disqualified. Cases before the ICC are brought in the name of the Prosecutor, who serves as lead counsel, is responsible for signing any OTP pleadings submitted, and is responsible formally and professionally for the conduct of any prosecution. The current Prosecutor is Karim A.A. Khan, K.C., a barrister from the United Kingdom, who was elected by the Assembly of States Parties as the Prosecutor of the ICC on February 12, 2021, and was sworn in on June 16, 2021.

## My Work on Darfur

9.    Darfur is a region in western Sudan that has been engulfed in protracted conflict since 2002. The conflict in Darfur is complex but generally arises from long-standing resource, ethnic, and power struggles between Arab militias, the central Sudanese government (as it has evolved over time), and regional ethnic groups. In the early 2000s, the conflict caused an estimated 300,000 deaths and displaced millions of people. Peace agreements were reached in 2010 and 2020, but each period of peace has been temporary.

10.    In 2023, ethnic violence and armed conflict reignited amid rising tensions between competing government and militia factions, namely the Sudanese Armed Forces (SAF) and Rapid Support Forces (RSF). In January of this year, United States Secretary of State Antony Blinken declared that the conflict between the SAF and RSF over the last two years has resulted in the world's largest humanitarian catastrophe and that genocide, crimes against humanity, and ethnic cleaning have been committed in Sudan.

11.    In 2005, the United Nations Security Council (UNSC), including the United States, determined that the situation in Darfur constituted a threat to international peace and

3

FILED UNDER SEAL

**FILED UNDER SEAL**

security. Accordingly, the UNSC referred the situation in Darfur to the ICC through Resolution 1593, effectively permitting the ICC to exercise jurisdiction over certain war crimes and crimes against humanity committed in Darfur, Sudan, from 2002 onwards.

12.     Since 2005, the ICC's investigation into the situation in Darfur has resulted in charges of genocide, war crimes, and crimes against humanity being brought against high-ranking officials.

13.     On October 21, 2021, I was assigned to the Darfur Unified Team and was subsequently elevated to the Head of that team. I am now lead counsel on the cases of *Prosecutor v. Al-Bashir, Prosecutor v. Hussein,* and *Prosecutor v. Harun* as well as on ongoing investigations arising out of the situation in Darfur, Sudan.



4

**FILED UNDER SEAL**

FILED UNDER SEAL



5

FILED UNDER SEAL

**FILED UNDER SEAL**



21.    I possess specialized qualifications that are critical to the effective and timely investigation of atrocities committed in Darfur.

22.    I am fluent in Arabic  his skill set enables direct communication with survivors, witnesses, and local stakeholders in North Darfur. This linguistic capability ensures accurate collection of testimonies without reliance on interpreters, minimizing miscommunication and fostering trust with affected communities, which is essential for rapid evidence gathering.

6

**FILED UNDER SEAL**

**FILED UNDER SEAL**



25.     With 15 years of experience in international criminal law, I am adept at building cases for genocide, war crimes, and crimes against humanity. My expertise ensures that evidence is collected and preserved in a manner admissible before the ICC, even under challenging field conditions, making my role pivotal to uncovering relevant information, developing that information into a coherent picture of the truth, and ensuring the investigation's success.

**The Effect of EO 14203**

26.     EO 14203 imposed blocking sanctions on the Prosecutor, Karim Khan, and prohibits U.S. persons, including myself and many members of my team, from providing or receiving goods and services to him or from him. These prohibitions create insurmountable obstacles to my ability to do my job for fear that work I do, and that I must instruct others to do, will be viewed by U.S. authorities as providing services for the benefit of Prosecutor Khan, who ultimately heads the OTP.

27.     In connection with investigating and prosecuting cases, I am required to share evidence with the Prosecutor – or at the very least make it available to him. I am obliged to draft legal pleadings that the Prosecutor signs and submits to judges under the authority of his office. I am obliged to consult with the Prosecutor on case strategy. I am obliged to obtain the Prosecutor's approval to travel for investigatory purposes. I am obliged to seek his approval to allocate personnel or other investigatory resources to investigation or advocacy.

**FILED UNDER SEAL**

**FILED UNDER SEAL**

28.     Since the Prosecutor was sanctioned, I have scrupulously avoided activities that could be construed as providing or receiving any services, benefits, or things of value to or from him. ██████████████████████████████████████████████████████████████████████████

29.     Put differently, EO 14203 has inhibited me – and continues to inhibit me – from fulfilling the time-critical investigative and prosecutorial duties pertaining to Darfur that I would be carrying out in the absence of EO 14203.

30.     As a U.S. citizen, I face an irreconcilable dilemma between my professional obligations as an ICC lawyer to investigate and prosecute atrocities on the one hand and complying with EO 14203 on the other. I have dedicated my career to using my voice, experience, and specialized skills to ensure accountability for those who perpetrate atrocities that stand out singularly in the world. Throughout my career in the Army and at the OTP, the objectives of my investigations and trial work have been fully supported by the United States. Yet, EO 14203, as presently implemented, is preventing me from doing that work, ████████ ████████████████████████████████████████████████████████████████████████████ ████████████ eyond the harm that I am suffering as a result, I fear that the consequences of my inability to investigate and advocate will be borne most heavily by the people of Darfur, whose chance for justice becomes more tenuous each day that goes by without action.

        Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 2, 2025

_____
                    Eric Iverson

8

**FILED UNDER SEAL**