**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ERIC IVERSON, | ) | CIVIL ACTION |
|  | ) |  |
| *Plaintiff*, | ) |  |
|  | ) |  |
| *v.* | ) |  |
|  | ) | No. 25-1353 |
|  | ) |  |
| DONALD TRUMP, *et al.*, | ) |  |
|  | ) |  |
| *Defendants*. | ) | DATE: May 5, 2025 |
|  | ) |  |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 5

STATEMENT OF FACTS .................................................................................................... 9

   I.   The International Criminal Court and Its Jurisdiction. ....................................... 9

   II.   The United States' Relationship to the ICC ..................................................... 10

   III.   The President issues EO 14203 Targeting the International Criminal Court.................. 14

ARGUMENT ..................................................................................................................... 16

   I.   Legal Standard ................................................................................................. 16

   II.   Plaintiff Is Likely to Succeed on the Merits .................................................... 16

      A.   EO 14203 Violates the First Amendment. ............................................... 16

      B.   EO 14203 Violates § 1702(b). ............................................................... 21

      C.   EO 14203 Violates § 1701(b) and Is Precluded by Subsequent Legislation. ............... 23

   III.   Emergency Injunctive Relief Is Necessary to Stop Ongoing Irreparable Harm .............. 29

   IV.   The Balance of Equities and the Public Interest Favor Injunctive Relief......................... 29

CONCLUSION .................................................................................................................. 32

i

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ..................................................... 17

*Biden v. Nebraska*, 600 U.S. 477 (2023).................................................. 23, 24, 27, 29

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011) ............................. 19

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)........................................ 20

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). 23, 26, 27, 28

*Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122 (D.C. Cir. 2023) ................................. 18

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)................................................. 27

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)................................. 19, 20, 27

*Holy Land Foundation v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) ............................. 27

*In re Primus*, 436 U.S. 412 (1978)........................................................... 19

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., & its* Locs. *1093, 558 & 25 v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.*, 590 F.2d 1139 (D.C. Cir. 1978)..... 20

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) ........................................... 30

*Lamont v. Postmaster*, 381 U.S. 301 (1965)................................................. 19

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) ..................................... 19

*Little v. Barreme*, 2 Cranch 170 (1804)...................................................... 27

*Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997)...................................... 19

*Marland v. Trump*, 498 F.Supp.3d 624 (E.D. Pa. 2020)................................... 22

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................. 20

*NAACP v. Button*, 371 U.S. 415 (1963)...................................................... 19

*Nat'l Council of Nonprofits v. OMB*, No. 25-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ...... 16

*NFIB v. OSHA*, 595 U.S. 109, 122–23 (2022) .............................................. 9

*Nken v. Holder*, 556 U.S. 418 (2009)......................................................... 29

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024) .................................................. 18

*OSJI v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021) ............................................................ passim

*Perkins Coie v. Trump*, 25-cv-00716-BAH, Dkt. 185, slip. Op. (D.D.C., May 2, 2025) ....... 18, 19

*Pursuing America's Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ......................... 17, 29, 30

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................. 30

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................. 17, 18, 20

*Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) .............................................................. 19

*Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781 (1988) .................................................... 20

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ............................. 18

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) .. 20

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000) ......................................................... 19

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ............................................................... 21

*TikTok v. Garland*, 145 S. Ct. 57 (2025) ..................................................................................... 25

*TikTok v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) ...................................................... 8, 16, 22, 25

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) .............................................. 17, 21

*United Transp. Union v. State Bar of Mich.*, 401 U.S. 576 (1971) .............................................. 19

*West Virginia v. EPA*, 597 U.S. 697 (2022) ........................................................................... 27, 29

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................................. 28

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ........................................................................................ 27

**Statutes**

22 U.S.C. § 7421 ..................................................................................................................... 12, 23

22 U.S.C. § 7427 ..................................................................................................................... 12, 23

22 U.S.C. §7422 ...................................................................................................................... 12, 24

22 U.S.C. §7433 ...................................................................................................................... 13, 24

50 U.S.C. § 1705 ............................................................................................................................ 14

American Servicemembers' Protection Act (ASPA), 116 Stat. 899 ............................................ 12

**Other Authorities**

Carl Campanile, *Andrew Cuomo joins high-powered legal team to defend Netanyahu against ICC's war crime claims*, New York Post, November 25, 2024 ................................................. 18

Explanation of Vote on the Sudan Accountability Resolution, USUN Press Release #055 (05) (March 31, 2005) ........................................................................................................................ 30

Jeffrey Gettleman, *Team on the Way to Collect Congo War Crimes Suspect*, N.Y. Times, March 21, 2013 .......................................................................................................................................... 11

John Bolton, Letter to the Secretary General of the United Nations, May 6, 2002 ..................... 25

John Bolton, *The Risks and Weaknesses of the International Criminal Court from America's Perspective*, 64 Law and Contemporary Problems 167 (2001) .................................................. 12

John Bolton, *Unsign That Treaty*, Washington Post, January 2, 2001 ......................................... 12

Staff Regulations for the International Criminal Court .................................................................. 10

Staff Rules of the International Criminal Court ............................................................................. 10

Statement on the Rome Treaty on the International Criminal Court, 37 Weekly Comp. Pres. Doc. 4, Dec. 31, 2000 ........................................................................................................................ 10

Tammy Bruce, United States Department of State Spokesperson, Press Briefing (April 15, 2025) ...................................................................................................................................................... 11

The Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025) ............................. 13, 27

U.S. Department of State, Press Release, "Transfer of Dominic Ongwen to the International Criminal Court," January 20, 2015 ........................................................................................... 11

UNSC Res. 1593 (Mar. 31, 2005) ................................................................................................ 11

UNSC Res. 1970 (Feb. 26, 2011) ................................................................................................ 11

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65 and LCvR 65.1, Plaintiff, Eric Iverson, moves for a temporary restraining order and a preliminary injunction prohibiting Defendants from imposing civil or criminal penalties on him under Executive Order 14203, Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 § 1 (February 6, 2025) (EO 14203). based on his investigation or prosecution of atrocities in Darfur, Sudan as a career prosecutor with the International Criminal Court (ICC).

Mr. Iverson is a U.S. citizen and an Army veteran. Since 2010, he has been a prosecutor in the ICC's Office of the Prosecutor (OTP), leading investigations and prosecutions of terrorists, war criminals, and the perpetrators of genocide. He is now the Head of the ICC's Darfur Unified Team and leads investigation and prosecution efforts in relation to an ongoing genocide that has already claimed 300,000 civilian lives and displaced nearly 3,000,000 people. The ICC's work in Darfur has, since its inception in 2005, been directly supported by the United States diplomatically, financially, and otherwise.

Since February 9, 2025, however, Mr. Iverson has been forced to cease investigating and advocating on behalf of victims in Darfur. That is because President Trump issued EO 14203, which imposes sanctions under the International Economic Emergencies Powers Act (IEEPA), 50 U.S.C. §§ 1701, *et seq*., against anyone who has been involved in or materially assisted the ICC's efforts to "investigate, arrest, detain or prosecute a protected person without consent of that person's country of nationality." EO 14203 defines "protected persons" as nationals of the United States and certain U.S. allies. On February 9, 2025, the President designated the Prosecutor of the ICC as a Specially Designated National (SDN) under EO 14203.

Mr. Iverson's work is solely focused on Darfur and does not involve any "protected persons." That does not insulate Mr. Iverson from EO 14203, however. Under the broad terms of EO 14203 and IEEPA, the designation of the ICC Prosecutor makes it a felony punishable by twenty-years in prison and millions of dollars in civil and criminal fines for "U.S. persons" like Mr. Iverson to – directly or indirectly – provide any service or benefit to, or receive any service or benefit from, the Prosecutor. EO 14203 prohibits Mr. Iverson from engaging in expressive activities that could be seen as supportive of the ICC Prosecutor, who is his boss, which prevents him from engaging in the practice of law as a member of the OTP. As such, EO 14203 plainly violates the First Amendment.

Mr. Iverson has proceeded on the assumption that President Trump did not actually intend to prevent U.S. citizens from working on matters relating to the genocide in Darfur, given longstanding U.S. support for such work and the fact that it is unrelated to "protected persons." Mr. Iverson has spent more than two months waiting to see whether the Department of the Treasury, Office of Foreign Asset Control (OFAC), would issue regulations or licenses to narrow the otherwise comprehensive sweep of EO 14203. He also assisted the Association of International Criminal Law Prosecutors, a professional association of which he is a member, in applying for a specific license from OFAC that would enable him to resume his work on Darfur. Should OFAC grant that specific license, the instant case would become moot. As of the date of this filing, however, OFAC has not acted on the license application.

Mr. Iverson, therefore, moves for a temporary restraining order and preliminary injunction to bar Defendants from enforcing EO 14203 against him in relation to any matter not involving a "protected person" within the meaning of EO 14203. If granted, this relief will allow

Mr. Iverson to resume his prosecuting genocide and other international crimes being committed in Darfur, without prejudice to the U.S. interests that EO 14203 purports to protect.

A temporary restraining order and a preliminary injunction are warranted. EO 14203 has already irreparably harmed Mr. Iverson by chilling his First Amendment rights to investigate, to seek the truth, and to advocate as an ICC prosecutor. Immediate interim relief is warranted now because the situation in Darfur has become even more urgent recently, to include a series of attacks on the Port of Sudan perpetrated yesterday, May 4, 2025, and the ongoing violation of Mr. Iverson's First Amendment rights has become concomitantly more severe in its consequences. Declaration of Eric Iverson (Iverson Decl.), May 2, 2025, ¶¶ 15-20.

Mr. Iverson is also likely to prevail on the merits. EO 14203 has only one precedent, a near-identical executive order President Trump issued in the final year of his first term that likewise targeted the ICC under IEEPA and designated the then-ICC Prosecutor as an SDN. That executive order was promptly enjoined by a district court in the Southern District of New York because it – like EO 14203 – was fatally overbroad in prohibiting First Amendment activities that had no relationship to the stated need to shield "protected persons" from investigation or prosecution before the ICC. *OSJI v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021).

EO 14203 violates the First Amendment for these same reasons and more. It broadly prohibits U.S. citizens, such as Mr. Iverson, from engaging in the core First Amendment protected activities that are incident to the practice of law, including conducting investigations to ascertain the truth, communicating with witnesses, experts, and others, preparing reports and memoranda, and advocating for criminal accountability. And it does so in a content-based and view-point discriminatory way.

Even if this Court accepts that the United States has a compelling interest in imposing restrictions on some core First Amendment activities, EO 14203 fails strict scrutiny because it is not narrowly tailored. As the district court found when enjoining the substantively identical sanctions program from 2020, such broad prohibitions "are not narrowly tailored because they sweep far more broadly than is necessary to address the Government's stated concern about the investigation and prosecution by the ICC of U.S. and allied personnel." *OSJI*, 510 F. Supp. 3d at 212. And, again, Mr. Iverson's work has nothing to do with U.S. or allied personnel, other than that U.S. personnel have tangibly *supported* his Darfur work over the years.

Mr. Iverson is also likely to prevail on the merits because EO 14203 violates IEEPA in at least two fatal respects. *First*, IEEPA has its own speech protections that are broader than the First Amendment. 50 U.S.C. §§ 1702(b)(1), (b)(3). As a court in this District held when enjoining the President's closely analogous effort to use IEEPA authorities against TikTok, "Congress precluded regulations that directly target permissible objects (like business-to-business transactions) but have the goal of indirectly controlling impermissible objects (like 'personal communications' or 'informational materials')." *TikTok v. Trump*, 507 F. Supp. 3d 92, 103 (D.D.C. 2020). EO 14203's explicit – indeed "direct" – targets are those who engage in core speech that the President disfavors, and those who provide services to, or receive services from, those targets.

*Second*, IEEPA only authorizes the President to invoke its authorities to confront an "unusual and extraordinary threat," which IEEPA describes as a "new threat." 50 U.S.C. § 1701(b). If these limits mean anything, they prohibit the President from using emergency economic sanctions to address a threat that was identified by the U.S. government twenty-five years ago and has been the subject of policy debates within the government since then. Congress

has squarely addressed the purported threat that ICC investigations might pose to the foreign policy interests of the United States and it has repeatedly considered and rejected proposals to grant the President authority to impose sanctions on the ICC and its personnel. EO 14203 is a naked "legislative work-around" that more than two-decades of careful Congressional attention precludes. *NFIB v. OSHA*, 595 U.S. 109, 122–23 (2022) (Gorsuch, J., concurring).

The requested relief should be granted also because it would not cause Defendants any harm, let alone harm sufficient to outweigh the ongoing irreparable harm suffered by Mr. Iverson. The scope of the interim relief requested explicitly carves out any activity that falls within EO 14203's animating rationale. Moreover, it is consistent with long-standing U.S. policy to support the prosecution of serious violations of international law in Darfur.

Granting interim relief therefore would ***further*** the government's foreign-policy interest as well as the public interest, which interests merge in a case such as this that involves violations of the First Amendment. Of course, it is in that merged interest to prevent violations of the First Amendment as well. And that collective interest is especially urgent here. Each day that passes under EO 14203's chilly shadow increases the chance that evidence which must be gathered to prevent impunity for grave violations of international law will be forever lost.

**STATEMENT OF FACTS**

**I.    The International Criminal Court and Its Jurisdiction.**

The International Criminal Court (ICC) was established by the 1998 Rome Statute, a multilateral treaty the United States played a key role in drafting. The creation of the ICC was the culmination of a decades-long push by the United States and other countries for a permanent mechanism to provide international criminal justice. When President Clinton signed the Rome Statute in 2000, he noted the United States's "long history of commitment to the principle of

9

accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda." Statement on the Rome Treaty on the International Criminal Court, 37 Weekly Comp. Pres. Doc. 4, Dec. 31, 2000.

The ICC has "the power to exercise its jurisdiction over persons for the most serious crimes of international concern," including genocide, crimes against humanity, war crimes, and the crime of aggression. Rome Statute, art. 1, 5. The ICC's jurisdiction is limited to crimes committed within the territory of a member state or by nationals of a member state, or upon a member state's election or a referral by the United Nations Security Council (UNSC). *Id*. art. 11(1). Today, 125 countries are parties to the Rome Statute, including thirty of NATO's thirty-two members. The United States signed the Rome Statute, but the Senate has not ratified it.

The ICC's Office of the Prosecutor (OTP) is responsible for investigating and prosecuting individuals alleged to have committed crimes within the ICC's jurisdiction. Karim A.A. Khan, K.C., is the ICC Prosecutor and heads the OTP. The OTP's employees, including Mr. Iverson, all serve under the supervision and control of the Prosecutor who is lead counsel in all cases, except if he has been recused. Under the Rome Statute, the Prosecutor has "full authority over the management and administration of the Office, including the staff, facilities and other resources thereof." Rome Statute, art. 42(2); *see also* Staff Regulations for the International Criminal Court § 1.2(c). OTP personnel are, by rule, "at the disposal of … the Prosecutor, as appropriate, for the performance of official functions." Staff Rules of the International Criminal Court, 101.9(b).

## II.    The United States' Relationship to the ICC

U.S. support for the OTP's work has transcended party lines. As one of the five permanent members of the UNSC, the United States has extended the ICC's jurisdiction to non-

member states via UNSC referral. Most relevant here, in 2005, the Bush administration assented to the referral of the situation in Darfur to the ICC. UNSC Res. 1593 (Mar. 31, 2005). The Obama administration went further and voted with the Security Council in 2011 to refer the situation in Libya to the ICC, urging "all States and concerned regional and other international organizations to cooperate fully with the Court and the Prosecutor." UNSC Res. 1970, ¶¶ 4-5 (Feb. 26, 2011).

The United States has also directly aided the ICC's prosecutorial efforts. In 2013, the United States turned Bosco Ntaganda over to the ICC for prosecution for alleged war crimes committed in the Democratic Republic of Congo after he sought refuge in the U.S. Embassy in Rwanda. Jeffrey Gettleman, *Team on the Way to Collect Congo War Crimes Suspect*, N.Y. Times, March 21, 2013, at A6. In 2015, the United States similarly transferred Dominic Ongwen to the ICC for prosecution as an alleged Lord's Resistance Army commander who committed atrocity crimes in Uganda. *See* U.S. Department of State, Press Release, "Transfer of Dominic Ongwen to the International Criminal Court," January 20, 2015.

The United States has long given substantial support to the ICC's investigation into the situation in Darfur, specifically. This support dates to the very inception of the ICC's investigation in 2005 and has extended into the present administration. Compl. ¶¶ 23–30. Most recently, the State Department condemned the newest outbreak of violence in Darfur and called for accountability in the same terms as every prior administration. *See* Tammy Bruce, United States Department of State Spokesperson, Press Briefing (April 15, 2025).

The United States also has long sought to address the potential that U.S. nationals and nationals of U.S. allies would be subject to the ICC's jurisdiction, i.e., the threat EO 14203 seeks to counter. Compl. ¶¶ 18-20. As far back as 2001, just a week after President Clinton signed the

Rome Statute, John Bolton wrote an op-ed, objecting that the ICC threatened the autonomy of U.S. political leaders. John Bolton, *Unsign That Treaty*, Washington Post, January 2, 2001. In a subsequent law review article, Bolton warned that the ICC would threaten the President with "the retroactive imposition of criminal liability" and that "Israel will be the target." John Bolton, *The Risks and Weaknesses of the International Criminal Court from America's Perspective*, 64 Law and Contemporary Problems 167 (2001). Bolton went on to serve as the Bush Administration's U.N. Ambassador

In 2002, Congress addressed these precise threats with the American Servicemembers' Protection Act (ASPA), 116 Stat. 899 (codified at 22 U.S.C. §§ 7421, *et seq*.), which addressed the threat of U.S. persons "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court." 22 U.S.C. § 7427. In enacting this law, Congress found "the Rome Statute creates a risk that the President and other senior elected and appointed officials of the United States Government may be prosecuted by the International Criminal Court. … No less than members of the Armed Forces of the United States, senior officials of the United States Government should be free from the risk of prosecution by the International Criminal Court, especially with respect to official actions taken by them to protect the national interests of the United States." 22 U.S.C. § 7421(9).

Congress carefully crafted the ASPA to broadly regulate the United States' relationship with the ICC to protect against these risks while permitting the United States to support certain ICC activities. For example, 22 U.S.C. §7422(c) introduced a safeguard to help ensure "none of the following persons will be investigated, arrested, detained, prosecuted, or imprisoned by or on behalf of the International Criminal Court with respect to actions undertaken by them in an

official capacity: (i) Covered United States persons; (ii) Covered allied persons; (iii) Individuals who were covered United States persons or covered allied persons."

At the same time, the ASPA explicitly protected many activities supporting the ICC's efforts: "Nothing in this subchapter shall prohibit the United States from rendering assistance to international efforts to bring to justice Saddam Hussein, Slobodan Milosovic [sic], Osama bin Laden, other members of Al Queda [sic], leaders of Islamic Jihad, and other foreign nationals accused of genocide, war crimes or crimes against humanity, or from rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine." 22 U.S.C. §7433.

Congress also has considered, but not passed, legislation to impose sanctions on the ICC itself and its personnel. Most recently, Congress considered a bill that would have authorized the President to issue an executive order under IEEPA "to block and prohibit all transactions in all property and interests in property of any foreign person" who:

> (A) has directly engaged in or otherwise aided any effort by the International Criminal Court to investigate, arrest, detain, or prosecute a protected person,
>
> (B) has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of any effort by the International Criminal Court to investigate, arrest, detain, or prosecute a protected person; or
>
> (C) is owned or controlled by, or is currently acting or purports to have acted, directly or indirectly, for or on behalf of any person that directly engages in any effort by the International Criminal Court to investigate, arrest, detain, or prosecute a protected person[.]

The Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. § 3 (2025) . "Protected person" was defined in substantively the same manner as it is in EO 14203. This bill died in the Senate in January 2025. 171 Cong. Rec. S410 (January 28, 2025).

13

### III.    The President issues EO 14203 Targeting the International Criminal Court

IEEPA authorizes the President to take specific actions in response to a national

emergency that constitutes an "unusual and extraordinary threat, which has its source in whole or

substantial part outside the United States, to the national security, foreign policy, or economy of

the United States." 50 U.S.C. § 1701(a). When the President declares such an emergency, IEEPA

permits the President to:

> block … regulate ... void, prevent or prohibit, any acquisition,
> holding, withholding, use transfer, withdrawal, ... dealing in, or
> exercising any right, power or privilege with respect to, or
> transactions involving, any property in which any foreign country or
> a national thereof has any interest by any person, or with respect to
> any property, subject to the jurisdiction of the United States.

*Id*. § 1702(a)(1)(B). Individuals designated under § 1702(a)(1)(B) are placed on the Specially

Designated Nationals and Blocked Persons List (SDN List) maintained by OFAC. Persons who

engage in most transactions with an SDN are subject to penalties under IEEPA. These include

civil fines in an amount equal to the greater of $377,700.17 or twice the value of a violative

transaction, and criminal penalties in the form of a fine of up to $1,000,000, and, if a natural

person, up to 20 years of imprisonment. 50 U.S.C. § 1705.

On February 6, 2025, President Trump invoked IEEPA in issuing EO 14203, determining

"that any effort by the ICC to investigate, arrest, detain, or prosecute ***protected persons***, as

defined in section 8(d) of this order, constitutes an unusual and extraordinary threat to the

national security and foreign policy of the United States, and [] hereby declar[ing] a national

emergency to address that threat." *See* EO 14203 pmbl. (emphasis added). EO 14203 clarifies

that the threat at issue arises from ICC investigations and prosecutions of "protected persons"

only: "The ICC has, without a legitimate basis, asserted jurisdiction over and opened preliminary

investigations concerning personnel of the United States and certain of its allies, including Israel,

… issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant." *Id*.

"Protected person" is defined as "any United States person" or a national of an "ally of the United States," which is, in turn, defined as a NATO member state or a "major non-NATO ally." *Id*. § 8(d). In an Annex to the Order, published on February 9, 2025, the Trump administration designated Karim Khan, the Prosecutor of the OTP, as an SDN.

To address the stated threat to "protected persons," EO 14203 imposes blocking sanctions on foreign persons who are deemed to have "directly engaged" or "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of," or were "owned or controlled by, or … have acted or purported to act for on behalf of, directly or indirectly" the ICC's efforts to "investigate, arrest, detain or prosecute a protected person without consent of that person's country of nationality." *Id.* § 1.

EO 14203 further prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order and the receipt of any contribution or provision of funds, goods, or services from any such person." *Id.* § 3(a). As a result, EO 14203 subjects those who engage in those activities "for the benefit of" Prosecutor Khan to severe civil and criminal penalties pursuant to IEEPA.

Because of its breadth, EO 14203 has prevented and continues to prevent Mr. Iverson from fulfilling his time-sensitive investigative and prosecutorial duties pertaining to the ongoing crisis in Darfur. Iverson Decl. ¶¶ 26-30. Under the plain text of EO 14203, Mr. Iverson faces ruinous criminal and civil liability if he continues to do his job because it necessarily involves activities that Defendants would likely deem "services" done for the "benefit" of the Prosecutor.

**ARGUMENT**

### I.    Legal Standard

A plaintiff seeking a temporary restraining order or preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). "These four considerations are factors, not elements." *Nat'l Council of Nonprofits v. OMB*, No. 25-239, 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025). Therefore, "[a] district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.'" *Id*. (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

### II.    Plaintiff Is Likely to Succeed on the Merits

Plaintiff is likely to succeed on the merits. *First*, EO 14203 violates the First Amendment by imposing content-based, viewpoint-discriminatory restrictions, including on the practice-of-law, and those restrictions are not narrowly tailored to any compelling government interest. *OSJI*, 510 F. Supp. 3d at 212 (enjoining the near-identical EO 13928 prohibiting ICC-related speech). *Second*, EO 14203 exceeds the President's authority under IEEPA because it seeks to directly regulate the communication of information. 50 U.S.C. § 1702(b); *see, e.g*., *TikTok*, 507 F. Supp. 3d at 103. *Third*, EO 14203 exceeds the President's authority under IEEPA because rather than addressing an "unusual and extraordinary threat," it targets a threat that has been preclusively addressed by Congress for a quarter century. 50 U.S.C. § 1701.

#### A.  EO 14203 Violates the First Amendment.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 816

16

(2000). At the preliminary injunction stage, since "the Government bears the burden of proof on

the ultimate question of [First Amendment] constitutionality, [plaintiff] must be deemed likely to

prevail unless the Government" carries its burden. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

The government cannot carry its burden here.

### 1.  EO 14203 Is A Content-Based, Viewpoint-Discriminatory Restriction on the Practice of Law.

Under the First Amendment, the government "has no power to restrict expression

because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576

U.S. 155, 163 (2015) (cleaned up). EO 14203 violates Mr. Iverson's First Amendment rights

because it imposes impermissible content-based, viewpoint-discriminatory restrictions, including

direct restrictions on the practice of law, and cannot survive the strict scrutiny analysis to which

such restrictions are subject. *Id.* at 163.

"Content-based laws—those that target speech based on its communicative content—are

presumptively unconstitutional." *Reed*, 576 U.S. at 163. "Government regulation of speech is

content based if a law applies to particular speech because of the topic discussed or the idea or

message expressed." *Id*. This inquiry "requires a court to consider whether a regulation of speech

'on its face' draws distinctions based on the message a speaker conveys." *Id*. Restrictions that

"regulate[] speech by its function or purpose … are distinctions drawn based on the message a

speaker conveys." *Id*. at 163-64; *see also Pursuing America's Greatness v. FEC*, 831 F.3d 500,

508 (D.C. Cir. 2016) (same).

EO 14203 is a content-based restriction because it targets speech that constitutes

"services by, to, or for the benefit of" Prosecutor Khan. EO 14203 § 3. As the Southern District

of New York court concluded when invalidating a substantively identical executive order in

2021, Mr. Iverson's "speech is restricted if, and only if, it has the function or purpose of

17

benefitting [Prosecutor Khan]. This is content-based restriction." *OSJI*, 510 F. Supp. 3d at 211; *see also Reed*, 576 U.S. at 163-64. To do his job and investigate and prosecute atrocities in Darfur, Mr. Iverson must put himself at the service of the ICC Prosecutor. Iverson Decl. ¶¶ 8, 26-30. Indeed, the ICC Prosecutor "is the head of the Office of the Prosecutor and oversees the investigations Plaintiff[] would support if able," and "it is unclear … how Plaintiff[] could provide services to the Office of the Prosecutor or to others involved in ICC investigations without indirectly benefitting [the Prosecutor]." *OSJI*, 510 F. Supp. 3d at 212. EO 14203 is therefore subject to strict scrutiny as a content-based regulation.

Moreover, EO 14203 discriminates based on viewpoint because it prohibits First Amendment activities, such as the practice of law, only if done for the "benefit" of the Prosecutor, as discussed. Advocating ***against*** the Prosecutor, even before the ICC itself, is permitted. *See*, *e.g.*, Carl Campanile, *Andrew Cuomo joins high-powered legal team to defend Netanyahu against ICC's war crime claims*, New York Post, November 25, 2024. "Using the powers of the federal government to target lawyers for their representation of clients … in an overt attempt to suppress and punish certain viewpoints, however, is contrary to the Constitution, which requires that the government respond to dissenting or unpopular speech or ideas with tolerance, not coercion.'" *Perkins Coie v. Trump*, 25-cv-00716-BAH, Dkt. 185, slip. Op., at 4 (D.D.C., May 2, 2025) (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023)).

Such "viewpoint discrimination is uniquely harmful to a free and democratic society," *NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024), and "will almost always be 'rendered unconstitutional.'" *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1141 (D.C. Cir. 2023); *see also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a

subject," that renders "the violation of the First Amendment … all the more blatant"). EO 14203 does precisely what the D.C. Circuit has held the First Amendment forbids: "'the government has no authority to license one side to fight freestyle, while forbidding the other to fight at all.'" *Frederick Douglass Found., Inc*., 82 F.4th at 1142 (quoting *Mahoney v. Babbitt*, 105 F.3d 1452, 1454 (D.C. Cir. 1997)). EO 14203 is therefore subject to strict scrutiny on this basis as well.

Given that EO 14203 forbids Mr. Iverson to do his job as an attorney, it also must be considered to target the practice of law, which is constitutionally impermissible. The practice of law, at its core, entails advocacy and the collection of information in the reasoned search for the truth, thus invoking the freedoms of speech, expression, and association. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 397 (2011); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001); *In re Primus*, 436 U.S. 412, 424 (1978); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971); *NAACP v. Button*, 371 U.S. 415, 428 (1963) (legal activities "are modes of expression and association protected by the First and Fourteenth Amendments"); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576 (1980) (First Amendment right to gather information); *Lamont v. Postmaster*, 381 U.S. 301, 307 (1965); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Perkins Coie*, slip Op., at 55. Moreover, EO 14203's broad prohibition on providing "services" forbids Mr. Iverson from providing "education, training, advice, and other forms of assistance," as well as "bespoke legal services" to the ICC Prosecutor. *OSJI*, 510 F.Supp.3d at 210 (cleaned up). *See, also, Humanitarian Law Project*, 561 U.S. at 27.

For these reasons, EO 14203 is subject to strict scrutiny as a restriction on practicing law as well. *Humanitarian Law Project*, 561 U.S. at 26-28; *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., & its* Locs. *1093, 558 & 25 v. Nat'l Right to Work Legal Def. & Ed. Found., Inc*., 590 F.2d 1139, 1147 (D.C. Cir. 1978) ("Any law that adversely affects the exercise of first amendment freedoms in connection with legal aid activity must be necessary to correct a serious and substantive evil and must be precisely drawn to serve that purpose.")

### 2. EO 14203 Cannot Survive Strict Scrutiny.

To survive strict scrutiny, EO 14203's restrictions must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. By design, this standard is exceptionally difficult to satisfy. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) ("It is rare that a regulation restricting speech because of its content will ever be permissible.")

Even assuming the government has a compelling interest in shielding "protected persons" from ICC scrutiny, EO 14203's restrictions are not narrowly tailored to serve that interest. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrificing speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).

EO 14203 is not narrowly tailored because it is, on its face, "vastly overinclusive." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011); *see also Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd*., 502 U.S. 105, 121-22 (1991). Taking EO 14203 at face value, the threat it seeks to counter is the possibility that the ICC would investigate "protected persons"—i.e., U.S. persons and persons of certain allied countries. Yet, as this very case demonstrates, EO 14203 restricts a vast array of First Amendment-protected activity that has nothing to do with the investigation of "protected persons." Indeed, EO 14203 prohibits the

provision of services to, or for the benefit of, the Prosecutor—regardless of whether the services are connected to any investigative or prosecutorial effort involving "protected persons." And as Mr. Iverson's case demonstrates, it chills investigations that the United States has supported since their inception. *See* Compl. ¶¶ 23–30.

EO 14203 is also not narrowly tailored because there are less restrictive alternatives. Under the tailoring requirement, "[i]f a less restrictive alternative would serve the Government's purpose, the [Government] must use that alternative." *Playboy*, 529 U.S. at 813. EO 14203 makes no effort to accommodate First-Amendment-protected activities or to otherwise limit its sweeping prohibitions to activities that pose a threat of investigation to "protected persons."

In its overbreadth and indifference to less restrictive means, EO 14203 has all the First Amendment flaws that the court determined were fatal to President Trump's previous effort to use IEEPA authorities against ICC personnel. Now, as then, there is no indication "that the Government even considered" alternative, less speech-restrictive means of addressing the "national emergency" and it broadly swept in First Amendment activities without distinction – even though plainly the government was aware of the legal flaws in the 2020 executive order. *OSJI*, 510 F.Supp.3d at 212; *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try.") And like that prior executive order, EO 14203 should be enjoined.

### B.  EO 14203 Violates § 1702(b).

IEEPA itself broadly carves-out First Amendment activities from the permissible scope of sanctions regulations. In the so-called "Berman Amendment," Congress expressly denied the President the authority to use IEEPA sanctions to "regulate or prohibit, directly or indirectly" the

traffic in "any information or informational materials," "whether commercial or otherwise," and "regardless of format, or medium of transmission." 50 U.S.C. § 1702(b).[1]

"Congress, in enacting the Berman Amendment, created an 'IEEPA-free zone,' excluding, as relevant here, the indirect regulation of informational materials from the President's otherwise broad emergency powers." *Marland v. Trump*, 498 F.Supp.3d 624, 641 (E.D. Pa. 2020). Courts have therefore held that IEEPA precludes sanctions that target First Amendment activity, even when done for hire. *See Kalantari v. NITV*, Inc., 352 F.3d 1202, 1209 (9th Cir. 2003) ("the IEEPA exemption for informational materials is a general limitation on the President's authority"). And as the court held when enjoining the President's closely analogous effort to use IEEPA authorities against TikTok, "Congress precluded regulations that directly target permissible objects (like business-to-business transactions) but have the goal of indirectly controlling impermissible objects (like 'personal communications' or 'informational materials')." *TikTok*, 507 F. Supp. 3d at 103.

As detailed above, EO 14203 directly targets core First Amendment activity. The conduct that qualifies an individual to be sanctioned is core First Amendment activity, to wit "investigat[ing]" so-called "protected persons" or otherwise assisting in their prosecution. And the broad restriction on providing legal services to the Prosecutor is a direct regulation of "information."

Congress intended the Berman Amendment's carve-out to be an explicit prohibition on the President's use of sanctions to restrict – "directly or indirectly" – "information that is

---

[1] These protections were legislated through 1988 ("Limitation on Exercise of Emergency Authorities") and 1994 ("Free Trade in Ideas") amendments to IEEPA. § 2502(b) of the Omnibus Trade and Competitiveness Act, Pub. L. No. 100-418, 102 Stat. 1107 (1988); § 525(c) of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, 108 Stat. 382 (1994) (the "Berman Amendment").

protected under the First Amendment to the U.S. Constitution." H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483. But by design EO 14203 restricts the transmittal of such information.

### C.  EO 14203 Violates § 1701(b) and Is Precluded by Subsequent Legislation.

Mr. Iverson is also likely to prevail on the merits because EO 14203 exceeds the limits Congress has placed on the President's sanctions authority pursuant to 50 U.S.C. § 1701(b). IEEPA is explicit that the President may only invoke its sanctions "to deal with an unusual and extraordinary threat" to the foreign policy interests of the United States. *Id.* Moreover, the President must be confronting a "new threat." *Id.* And the "authorities granted to the President" to impose sanctions and to enforce those sanctions with ruinous civil and criminal penalties, "may not be exercised for any other purpose." *Id.*

However expansive the meaning of the words "unusual and extraordinary" might be, a threat that has been broadly understood and specifically addressed by Congress for a quarter century is not "new." "Congress is not unaware of" the possibility that the ICC might "investigate, arrest, detain or prosecute" nationals of the United States and its non-consenting allies. *Biden v. Nebraska*, 600 U.S. 477, 503 (2023). To the contrary, over two decades ago – in 2002 – "Congress crafted a specific legislative response," *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 157 (2000), to meet the precise threat that "the President and other senior elected and appointed officials of the United States Government may be prosecuted by the International Criminal Court." 22 U.S.C. § 7421(9).

With the American Servicemembers' Protection Act, 116 Stat. 899 (codified at 22 U.S.C. §§ 7421, *et seq.*), Congress addressed the threat of U.S. persons "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court," 22 U.S.C. § 7427, while

23

still permitting the United States to support ICC activities that were in the national interest. *Id*. § 7422(c), § 7433.

Congress has also enacted appropriations, findings, and resolutions supporting ICC investigations that align with the United States' policy priorities. *See*, *e.g.*, Further Consolidated Appropriations Act, 2024, 138 Stat. 460, § 7034(r); William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, 134 Stat. 3388 §§ 1263, 1276; Department of State Rewards Program Update and Technical Corrections Act of 2012, 126 Stat. 2492; National Defense Authorization Act for Fiscal Year 2008, 122 Stat. 3 § 1212; Darfur Peace and Accountability Act of 2006, P.L. 109-344 (October 13, 2006), 120 Stat. 1869; S. Res. 546, 168 Cong. Rec. S1180; S. Res. 188, 165 Cong. Rec. S4736; S. Res. 144, 159 Cong. Rec. S5302; S. Res. 90, 159 Cong. Rec. S2853; S. Cong. Res. 16, 153 Cong. Rec. S2540.

This carefully calibrated legislation reflects debate among high-level officials about the ICC which has not been "confined to the halls of Congress." *Nebraska*, 600 U.S. at 503. When President Clinton signed the Rome Statute, he also suggested that the Senate withhold ratification, noting the threat that the ICC "will not only exercise authority over personnel of states that have ratified the Treaty, but also claim jurisdiction over personnel of states that have not." President Clinton, Statement on Signature of the International Criminal Court Treaty, Washington, DC, December 31, 2000.

These threats were identified also by John Bolton, a prominent national-security and foreign-policy commentator and official, in op-eds and law review articles that discussed the risk that U.S. political figures and U.S. allies, such as Israel, might be subject to ICC investigation. Compl. ¶¶ 18-21. These threats are also why President Bush tasked Bolton with notifying the United Nations that the United States had repudiated the Rome Statute. John Bolton, Letter to the

Secretary General of the United Nations, May 6, 2002. And they are why administrations across the partisan spectrum have insisted upon diplomatic guarantees from nearly 100 foreign countries that U.S. personnel will not be sent to the Hague,[2] while at the same time providing direct financial, diplomatic, and other support to the ICC to advance the national interest. Compl. ¶¶ 22–38.

Only in the last year of President Trump's first term, did any administration seek to address these long-identified threats with IEEPA sanctions on the ICC and its personnel. *See* EO 13928. Under EO 13928, the Prosecutor of the ICC was designated as an SDN. Like the initial imposition of sanctions against TikTok, however, *TikTok*, 507 F. Supp. 3d at 103, EO 13928 was enjoined on free speech grounds, *OSJI*, 510 F.Supp.3d 198, and the Biden administration rescinded it shortly after taking office. *See* EO 14022, Termination of Emergency with Respect to the International Criminal Court, 86 Fed. Reg. 17895 (April 1, 2021).

Unlike its response to the decision invalidating the TikTok sanctions, however, Congress did not respond to the invalidation of EO 13928 with legislation to ratify the President's determination that the ICC should be treated as the legal equivalent of a foreign adversary country, a terrorist organization, or a drug cartel. *Cf. TikTok v. Garland*, 145 S. Ct. 57, 63-65 (2025). Instead, Congress continued, as it has since 2002, continued to balance the threats that the ICC might pose to the United States' foreign policy and national security interests with the benefits that the ICC's unique role in the world can provide in relation to those same interests.

In 2022, for example, the Senate unanimously passed a resolution stating, "the International Criminal Court (ICC) is an international tribunal that seeks to uphold the rule of

---

[2] Georgetown Law Library, International Criminal Court - Article 98 Agreements Research Guide, *available at* https://guides.ll.georgetown.edu/c.php?g=363527&p=2456099.

law, especially in areas where no rule of law exists, by investigating and trying individuals charged 'with the gravest crimes of concern to the international community: genocide, war crimes, crimes against humanity and the crime of aggression'" and resolved to "encourage[] member states to petition the ICC or other appropriate international tribunal to take any appropriate steps to investigate war crimes and crimes against humanity committed by the Russian Armed Forces and their proxies and President Putin's military commanders, at the direction of President Vladimir Putin." A resolution expressing the sense of the Senate condemning the Russian Federation, President Vladimir Putin, members of the Russian Security Council, the Russian Armed Forces, and Russian military commanders for committing atrocities, including alleged war crimes, against the people of Ukraine and others, S. Res. 546, 169 Cong. Rec. S1180. And in 2024, Congress appropriated funds to support the ICC directly, including "not less than $2,500,000 as a contribution to the Trust Fund for Victims" associated with the ICC and $2,500,000 for the ICC's investigations and prosecutions related to the situation in Ukraine. Public Law 118-47, Section 7034(r).

As this twenty-five history makes clear, "Congress, for better or for worse, has created a distinct regulatory scheme" to balance the precise threat EO 14203 purports to address with the unique, significant benefits that ICC investigations and prosecutions can offer in advancing the foreign policy and national security interests of the United States. *See Brown & Williamson* 529 U.S. at 159–60. EO 14203 disregards that balance and no matter how grave the threat an ICC investigation into the actions of U.S. nationals or non-consenting U.S. allies might be, it is not a "new threat." 10 U.S.C. § 1701(b). It is a threat that Congress has both recognized and specifically legislated to address.

What is more, "Congress considered and rejected several proposals to give the [President] the authority" that EO 14203 claims to assert. *Brown & Williamson*, 529 U.S. at 147; *see also West Virginia v. EPA*, 597 U.S. 697, 731–32 (2022). Most recently, Congress considered but failed to pass the Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025), from whose text most of EO 14203 is taken verbatim.

The President may not create a sanctions program that targets the ICC when Congress "has consistently rejected proposals to amend [IEEPA] to create such a program." *West Virginia*, 597 U.S. at 731–32. "Taken together, these actions by Congress over the past [twenty] years preclude an interpretation of [IEEPA] that grants" the President the discretion to use the emergency sanctions authorities granted by IEEPA to target the ICC and its personnel. *Brown & Williamson*, 529 U.S. at 155.

Mr. Iverson does not dispute that IEEPA's language is broad, and that the President is entitled to deference when identifying threats to the national security and foreign policy interests of the United States. *Humanitarian Law Project*, 561 U.S. at 33–34; *Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). But deference to the President's determination that a threat exists does not grant the President license to disregard IEEPA's explicit condition that its sanctions authority may only be used to confront a "new threat" that is "unusual and extraordinary."

Foreign policy and national security precedents dating to the Founding have consistently reaffirmed that the President must respect the express and implied limits of the authorities that Congress has granted. *See, e.g., Nebraska*, 600 U.S. at 494; *Hamdan v. Rumsfeld*, 548 U.S. 557, 623 (2006); *Little v. Barreme*, 2 Cranch 170, 177–78 (1804); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 114 (D.D.C. 2020); *see Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("There are limitations,

of course, on the power of the Executive under Article II of the Constitution and in the powers

authorized by congressional enactments, even with respect to matters of national security.").

At bottom, Mr. Iverson's case involves a question no different than that presented in the

*Steel Seizure* case, where the Supreme Court held:

> It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of [the ICC], to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld. To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952).

To find that the President has the authority to impose sanctions on the ICC and its

personnel under IEEPA, "one must not only adopt an extremely strained understanding of

['unusual and extraordinary threat'] as it is used throughout the Act—a concept central to

[IEEPA's] regulatory scheme—but also ignore the plain implication of Congress' subsequent

[ICC]-specific legislation. It is therefore clear, based on [IEEPA's] overall regulatory scheme and

the subsequent [ICC] legislation, that Congress has directly spoken to the question at issue and

precluded the [President] from" doing what EO 14203 does. *Brown & Williamson*, 529 U.S. at

160–61.

The United States and the ICC have a "unique political history" spanning a quarter

century and Congress has created "a distinct regulatory scheme" to balance the threats and

benefits to American foreign policy interests that have been self-evident since its inception.

*Brown & Williamson*, 529 U.S. at 159–160. EO 14203 is a naked attempt to "seiz[e] the power of

the Legislature" and the President's "assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself." *Nebraska*, 600 U.S. at 503 (quoting *West Virginia*, 597 U.S. at 731). The Executive Branch may not resort to such a naked "legislative work-around." *NFIB v. OSHA*, 595 U.S. 109, 122–23 (2022) (Gorsuch, J., concurring).

### III.    Emergency Injunctive Relief Is Necessary to Stop Ongoing Irreparable Harm

"In First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing America's Greatness*, 831 F.3d at 511. Still, Mr. Iverson's "loss of First Amendment 'freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 511 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)) (cleaned up).

As discussed in *OSJI*, Mr. Iverson has experienced an "actual chilling effect." 510 F.Supp.3d at 216 (cleaned up). "The prospect of enforcement under IEPPA has caused [Mr. Iverson] not to speak, and hence to forgo exercising [his] First Amendment rights." *Id.* Prior to EO 14203, Mr. Iverson provided legal services under the supervision of and at the direction of the Prosecutor. Since EO 14203 was issued, Mr. Iverson has been chilled from conducting time-sensitive investigations in Darfur. *See* Iverson Decl. ¶¶ 15 -18, 26- 30. Therefore, "enjoining Defendants from enforcing IEEPA's civil and criminal penalties against [Mr. Iverson] would eliminate this chill and prevent irreparable harm." *OSJI*, 510 F.Supp.3d at 216.

### IV.    The Balance of Equities and the Public Interest Favor Injunctive Relief

Given that the government is the defendant here, the analysis of whether the requested injunction would injure the government or be in the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing America's Greatness*, 831 F.3d at 511 ("the

[government's] harm and the public interest are one and the same, because the government's interest *is* the public interest."). Those factors – examined together – overwhelmingly support granting the relief sought.

The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Put differently, "enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *see also Pursuing America's Greatness*, 831 F.3d at 511 ("there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation").

The unconstitutionality of EO 14203 is dispositive as to these factors. And even if EO 14203 had constitutional applications when applied to activities directed at "protected persons," neither Mr. Iverson's work nor the interim relief sought, has ***anything*** to do with "protected persons." Mr. Iverson's work focuses entirely on the investigation of serious violations of international law in Darfur; an investigation the United States has itself actively supported since its inception. *See* Compl. ¶¶ 23–30.

Indeed, the ICC only has jurisdiction over Darfur because the United States assented to a U.N. Security Council resolution referring the situation in Darfur to the ICC. As the Acting US. Ambassador to the United Nations explained at the time, the United States supported the ICC's jurisdiction over the situation in Darfur "because the resolution provides protection from investigation or prosecution for U.S. nationals and members of the armed forces of non-state parties." Explanation of Vote on the Sudan Accountability Resolution, USUN Press Release #055 (05) (March 31, 2005). In other words, the jurisdiction-enabling resolution for the ICC's work in Darfur is consistent with EO 14203's "protected persons" concern.

Congress also long ago endorsed the ICC's investigation into the situation in Darfur and authorized the imposition of sanctions against those implicated in crimes there; sanctions President Bush immediately implemented. *See, e.g.*, S. Res. 188, 165 Cong. Rec. S4736; Darfur Peace and Accountability Act of 2006, P.L. 109-344 (October 13, 2006), 120 Stat. 1869; EO 13412, 71 Fed. Reg. 61396 (October 13, 2006); H. Res. 1328 (November 20, 2024). And the State Department continues to offer a multi-million-dollar reward for information leading to the capture of suspects wanted by the ICC for crimes committed in Darfur. Compl. ¶ 30.

Given this long history, granting interim relief will not only cause no harm to the government's legitimate interests, but it would ***advance*** those interests. The requested temporary restraining order and preliminary injunctions therefore serve several compelling public interests, and should be granted "to protect the independence of counsel to represent their clients vigorously and zealously, without fear of retribution from the government simply for doing the job of a lawyer." *Perkins Coie*, slip. Op., at 102.

## CONCLUSION

The Court should grant Mr. Iverson's motions for a temporary restraining order and

preliminary injunction and enjoin Defendants from enforcing civil or criminal penalties against

Mr. Iverson under EO 14203 and IEEPA.

Dated: May 5, 2025                          Respectfully submitted
       Washington, D.C.

                                            /s/ Allison Ferber Miller
                                            Allison Ferber Miller
                                            Law Office of Allison Ferber Miller
                                            5619 2nd Street South
                                            Arlington, VA 22204
                                            321-945-7615
                                            allisonferbermiller@gmail.com

                                            HUMAN RIGHTS FIRST
                                            Joshua Colangelo-Bryan*
                                            121 West 36th Street, PMB 520
                                            New York, NY 10018
                                            212-845-5243
                                            colangeloj@humanrightsfirst.org

                                            * Pro hac vice application forthcoming

                                            *Attorneys for Plaintiff*